IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff | | |
| | : | |
| v. | : | Criminal Action No. 17-17-LPS |
| | : | |
| PAUL HURSEY, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT PAUL HURSEY'S SENTENCING MEMORANDUM**

Defendant, Paul Hursey, by and through his undersigned counsel, Dina Chavar, Esquire, submits the following memorandum in support of his January 3, 2018 sentencing hearing. For the reasons set forth below, Mr. Hursey respectfully requests a variance from the advisory guidelines range, to a sentence of home confinement, with strict conditions imposed, to be followed by a 3-year period of supervised release. Such sentence would be sufficient, but no greater than necessary, to comply with the sentencing directives set forth at 18 U.S.C. § 3553.

**I.  INTRODUCTION**

This will never happen again. Paul Hursey never committed a crime before this conduct, and he will not re-commit. Paul Hursey is a true first offender. At 48-years-old, he has had no juvenile or adult convictions – not even an arrest. He served honorably in the United States Air Force for 24-years before retiring, and then taking a position as a guard at the James T. Vaughn Correctional Center in Smyrna, Delaware. Over an approximately 6-month period of time, Paul's aberrational conduct - - smuggling contraband into the prison and into the hands of inmates - -

1

brings him before the Court for sentencing

Since the commission of this offense, Paul returned to the law abiding, productive lifestyle he had always led. Having been arrested in May of 2016, he has demonstrated acceptance of responsibility for this crime since that time. Paul has been on pretrial release for almost 2-years, maintaining complete compliance with all of the conditions of his release. While not only remaining steadily employed with Perdue Foods, L.L.C. in Milford, Delaware since September of 2016, he has been promoted to a position of greater responsibility in the relatively short period of his employment with Perdue Foods. Paul is now the Process Safety Manager Coordinator. Paul is truly remorseful, ashamed, and angry with himself for having committed this conduct.

This will never happen again; Paul Hursey will not commit another crime. A sentence of imprisonment is not necessary to deter, punish or rehabilitate Paul. A sentence of home confinement, coupled with imposed strict conditions, and followed by a 3-year period of supervised release is sufficient, but no greater than what is necessary, to achieve the sentencing directives set forth at Title 18 of the United States Code at Section 3553.

II.     **PAUL HURSEY'S PERSONAL HISTORY & THE OFFENSE CONDUCT**

Paul takes his responsibilities to family very seriously. It can fairly be stated that his lifetime is primarily characterized by providing, supporting and being responsible for his family, while serving this Country in the armed forces for over 2 decades. He is a loyal, trustworthy, loving man who engaged in a 6-month period of conduct that is completely aberrational from the life he led over the past 48 years. The commission of this crime was not motivated by greed. The

2

small amount of money that Paul made smuggling contraband into the prison, in no way allowed him to lead a more glamorous, abundant lifestyle. Rather, it simply helped him to make ends meet, to allow his daughter to continue her college studies without taking a second job, and to allow him to keep up with his spousal support payments. This crime was motivated by the desire to continue supporting his family, while going through a divorce from a 27-year marriage that was never a good one, and trying to manage it all on a dramatic income reduction. Paul recognizes the poor decision he made in agreeing to smuggle contraband into the prison and sorely regrets having done so. Any sentence of imprisonment is not necessary to punish, deter or rehabilitate Paul Hursey; he has been punished, he is deterred and rehabilitation is demonstrated by his return to the law-abiding productive lifestyle he led for 48-years, but for the brief 6-month departure from that lifestyle during the commission of this offense. A sentence of house arrest, followed by a 3-year term of supervised release, satisfies the codified goals of sentencing while being no more than what is necessary to achieve those goals.

### Personal History[1]

Paul began carrying the heavy burden of family responsibility from a very young age. He was born to Lela Hursey on July 10, 1968 in Mount Vernon, New York. He never learned the identity of his father. Without much explanation as to why, Paul continues to believe that a man named "Herbert Martin" is his father. However, Mr. Martin denies being his father, and he and his mother never speak of him. Paul believes that his looks are very similar to Herbert Martin's, whose looks he only knows from a singular photograph that his mother has of him; a photograph

---

[1] The information provided in this section is derived from counsel's numerous interviews with her client, as well as interviews with her client's children and new wife.

that he has seen a handful of times throughout his life. Paul's school transcripts, do not list Herbert Martin as his father; listed as his father is a man named James Paul. He has no relationship with James Paul; does not know a James Paul, nor has his mother ever spoken to him about James Paul. Paul Hursey not only grew-up without a father, he grew-up with a lot of questions about his father: why does he not know the man identified as his father on his school papers?; why does his mother have a picture of a man that he thinks he looks like?; and why does his mother claim that man is not his father?

Being raised solely by his mother, and having no siblings, Paul's childhood consists of memories of times spent with his mother. His mother's family lives in North Carolina, and he did not know them. He does not know what brought his mother to New York, nor why she never returned to North Carolina. Although he describes his childhood as being somewhat lonely – as it truly consisted of just he and his mother – he would not say that he was sad. He never doubted his mother's love and asserts that he was always cared for well. His mother had friends, who would help her at those infrequent times when she needed an adult to care for Paul while she went out. He was never left alone nor neglected in any way.

His mother worked at Consumer Reports Research Center for as long as he can remember. Paul recalls financially struggling, but his mother never complaining about it and trying to keep him from worrying about their finances. They lived in a working-class neighborhood with a strong influence of low income households. At 14-years-old, he found employment so that he could contribute to the financial responsibilities of the household. His mother did not ask him to get a job or to provide a financial contribution to the household. But by age 14, he could see for himself that their situation was difficult for his mother to manage

alone. His job allowed him to pay a portion of the household bills, and he was proud that he was able to help.

At an early age, Paul knew he would leave New York to find his life in an area not so "active." Paul characterizes New York as a place where there is "too much going on," and he wanted a simpler life where he did not have to worry about crimes and other unwanted behavior going on around him. A life in service to the armed forces fit the bill for the type of lifestyle Paul was looking to lead.

Paul enlisted in the Air Force in 1988, where he was placed on Administrative Duty. There, he began in a job that involved inputting information into the computer system, which was fairly new to the military services at that time. Having excelled in this position, over his 24-years of service, he continued to grow in his abilities was promoted accordingly. Defense counsel received over 1,000 pages of reports from the armed services documenting Paul Hursey's service over 24-years. In those 1000 plus pages, there was not one write-up for poor conduct or performance. He never had any disciplinary write-ups or issues on any level. His performance over 24-year tenure with the Air Force was consistently the positive. During his last 3-years of service, Paul was stationed at the Dover Air Force Base.

Also in1988, the year Paul enlisted, he married Mary Thomas. Although the marriage was not a good one, and Paul quickly learned that "it was a mistake from the beginning," the couple remained married for 27-years. Paul did not want his children to grow-up without a father, like he did. Even though he knew that he would maintain contact with his children if they divorced, two concerns drove his decision to remain in the marriage. First, his ex-wife is an

5

alcoholic,2 and Paul was concerned about the environment his children would be in when he was not there to monitor the situation; and second, he did not want his children growing up in a household without both parents living in it. Paul Hursey, for a reason often told though no less true, stayed in the marriage for his children. The couple divorced in January of 2015, once the children reached the age of adulthood, and Paul retired from the Air Force.

### The Marriage and Paul's Commitment to his Children

Paul and Mary Hursey had their first child, a son they named Isaiah, within the first year of their marriage. Their daughter, India, was born 8-years later. Isaiah, now 27-years-old, follows in his father's footsteps by serving in the United States Air Force, being currently stationed in Virginia. When he is on leave, he lives in his father's home. India, now 19-years-old, attends Delaware Technical Community College where she is pursuing a degree in Early Childhood Education. India lives with Paul. Neither of his children wanted to live with their mother.

India's relationship with her mother is very strained due to many embarrassing experiences involving her mother's intoxication in front of her school friends. One of the main reasons Paul did not relocate from Delaware after retiring, was because his children were young adults who had set roots and friends in the Dover area. He knew they would not want to live with their mother, nor did he want them to live primarily with their mother. As a result, he remained in Delaware.

### The Offense Conduct

Paul worked as a guard at Smyrna for well over a year before he began smuggling

---

2 Undersigned counsel spoke with both Paul's son and daughter, who confirmed that their mother's addiction to alcohol created havoc in the household.

contraband into the prison. The smuggling began not long after he and his wife separated. His wife never earned any money that contributed to the family finances in any substantive way, and they always lived in military housing in order to keep expenses down. However, once he retired, his pension alone was not enough to sustain the family financially. He took the job at Smyrna in order to make ends meet, but the pay was very low. Once he started paying spousal support, he simply could not make ends meet. His daughter was living with him and going to school. He wanted her to be able to concentrate on her studies and to not work too many hours that would distract from her studies and jeopardize her success. He knew his ex-wife would not be able to maintain a full-time job and needed the spousal support. Paul Hursey is a man who accepted the financial responsibilities for a household since he was 14-years-old. He was not able to turn-off that acceptance of responsibility simply because he and his wife were divorcing. He still felt responsible for her, as well as for their adult children. However, the money coming in was not enough to maintain even the most minimum level of their lifestyle. It was during this period that Paul succumbed to temptation and began smuggling contraband into the prison. The smuggling began with the smuggling in of Muslim oils and other somewhat inconsequential items. However, the smuggling did grow into cell phones and some personal use illegal drugs. Paul does not wish to minimize the severity of the items he ultimately smuggled into the prison and the detrimental effect those items could have in the hands of inmates.

     The offense conduct may have lasted no more than 6 months before it was discovered and caused Paul to lose the job – suspended without pay in February 2016, and then terminated sometime in June of 2016. Within a few months after his termination, he secured employment with Perdue Foods in Milford, Delaware. There, he began in the production department and has

since been promoted to Program Safety Manager as a Refrigeration Coordinator. He started there earning $12.25 per hour, and is now earning $16.30 per hour. In addition, being promoted, Perdue also recognized Paul's value by sending him off-site for training seminars, thus investing in his ability to grow within the company and making his value to the company known to him by making such investment.

**Post-Offense Conduct**

Earlier this year, Paul married Jennifer Jones, a woman he has known for two years, first as a friend, and then romantically. Ms. Jones, now Mrs. Hursey, is aware of the charges and upcoming sentencing. Jennifer was astounded when Paul told her about the charges. She told counsel that she never would have thought Paul would engage in such conduct, knowing him to be a "responsible, honest and reliable person."3

Jennifer told counsel that when Paul first revealed the pending criminal charges to her, it was a "terribly difficult time for both of [them]." She literally was "shocked" when he first told her. However, the aftermath of the revelation was far worse than the initial disclosure. After Paul told her, he literally "disappeared for a while." He would not return her text messages or answer her telephone calls. He was "so filled with shame and embarrassment that he couldn't speak with [her]." Jennifer believes that she may have made the situation worse, because when he told her about it, she was so dumbfounded – "I just couldn't imagine it; felt like I really didn't know him after all, because I never would have thought he would commit a crime."

Jennifer describes her reaction to the news as emotionally charged, and believes she made

---

3 This quote, as well as the quotes from Mrs. Hursey in the following paragraphs, are derived from counsel's conversations with Mrs. Hursey. Jennifer Hursey will attend the sentencing hearing and plans to address the Court at that time.

Paul feel even worse about it. "He was so nervous and ashamed when he was trying to tell me, and I kept asking questions, and saying that I couldn't believe it, and I think I made the whole situation worse." According to Paul, nothing and nobody could make the situation worse than how he already was feeling about it. While he felt horrible having to tell Jennifer about it, and seeing her reaction, Paul describes her reaction as the way any law-abiding, good person would react. What he recalls most about that time was that it made him realized that she deserved better than him; she deserved a man with no criminal record who was good and honest and hardworking, and he felt like he was none of those things any longer.

For weeks after Paul revealed his court-related problems to Jennifer, he quite literally "disappeared" from her life. He could not bring himself to answer her calls and talk to her. He could not return her text messages. He recalls feeling a deep shame and embarrassed by having "fooled" himself into believing that a good woman like her would want to be with him after hearing that he committed a crime. His remorse over having committed this conduct grew to such a degree that he felt himself withdrawing from life and feeling depressed. This 48-year-old man never behaved in any way throughout his life that would cause him to feel shame. He felt like he did not even know who he was any longer. He completely withdrew into himself, and did not engage in life other than to wake-up, go to work, come home and go to sleep. He was severely depressed.

Fortunately for Paul, he had a good woman who did love him and was able to look past the disappointment of learning of his criminal conduct. Jennifer never gave up on Paul. She persisted in her efforts to reach him. Finally, she was able to do so and the couple worked through this difficult obstacle. Later, Paul would explain to Jennifer how she saved his life. Paul

9

told her that he felt like he "was in a hole, sinking deeper, until she pulled him out of it." Jennifer states that they had to "work hard together to get Paul out of that hole." She continues to believe Paul "to be a very good man, more so now than I did before I learned of his court problems." Jennifer explains that it:

> was a very difficult time for us and [she] worries what prison will do to him. He has been in prison since this whole thing came about. He has really taken it to heart and is so remorseful that I still worry sometimes that he could be suicidal.4 This is a man who had a lifetime of holding his head high, took care of his mother since he was 14-years-old and served honorably in the armed services for 24 years. Now, he cannot get past thinking of himself as a criminal and the shame he feels around that is overwhelming. When Paul speaks about the conduct, he is filled with remorse.

Jennifer describes Paul as being depressed and anxious over what will come as a result of the conduct. Jennifer has no doubt that Paul will never engage in criminal conduct again. She is very concerned about the effect jail may have on him. He is very proud of his service to this Country, but states that now he acts like he has no right to be proud of anything.

Paul's children, Isaiah and India, echo the sentiments shared by Jennifer. They too are astounded at hearing that their father would commit a crime. Both have expressed that it is almost like "he became a different person for a while." His daughter, India, tries to justify her father's conduct by saying that she knew he was really struggling financially, and that her mother can be very difficult. India believes that her father would only do what he did for his family. "He would not do that so he could have money. He's not

---

4 Paul understands that Jennifer worries that he may experience suicidal thoughts at times, but he adamantly denies any thoughts of suicide and asserts that he would not desert his family that way.

greedy and we don't live large. He would only do that because he must have felt like the family really needed the money for just the basics."5

Since the offense conduct, Paul went back to the man he always was - honest, hardworking. He has not only maintained employment, but has successfully grown into a management position. His marriage with Jennifer is a strong and supportive one. Paul provides emotional support and caregiving to his step-daughter's (Jennifer's 25-year-old daughter) son, Jeremiah (5-years-old), so that his step-daughter can continue her schooling while working two jobs. However, he continues to struggle with coming to terms that he committed a crime and suffers with low self-esteem and depression.

There is no dispute that for a relatively short period of time – approximately 6 months – Paul engaged in conduct completely aberrational for him. His remorse over that terrible decision is real. His efforts to turn his life back to the life he lived for 48 years are real and have been successful. There is no dispute that Paul engaged in criminal conduct for 6-months of his 48-year life. But, those 6-months should not define him. He is a lot more than those 6 months, and that terrible decision he made during a time of extreme emotional and financial distress.

### III. THE ADVISORY SENTENCING GUIDELINES RANGE DOES NOT ACCURATELY REFLECT PAUL HURSEY'S CONDUCT

The final presentence report calculates the advisory guidelines range at 30-37 months, based on a total offense level of 19 and a criminal history category of I. This calculation includes

---

5 Undersigned counsel spoke with both Isaiah and India, and the quotes attributed to them in this memorandum are derived from those conversations. an

an additional 2 levels pursuant to USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1), which relies primarily on Mr. Hursey's estimation of the money he made on the conduct, which barely exceeds the $6500 threshold for application of this enhancement. The government estimates the total amount of the bribe money Paul received as $6825. Again, this figure is based on statements Paul made to agents estimating the amount of money he received on the bribes. It is equally likely that Mr. Hursey could have made less than $6500. If this 2-level enhancement were not applied, Mr. Hursey's advisory guidelines range would be 24 to 30 months, calculated on a total offense level 17 with a criminal history category I. The defense is not objecting to the application of this guidelines enhancement. However, the defense argues that it provides a basis in consideration of a downward variance.

In addition, the advisory guidelines range also includes a 4-level enhancement based on the determination that "the offense involved a sensitive position," pursuant to U.S.S.G. § 2C1.1(b)(3). Defense counsel submitted an objection to the application of this enhancement, which is noted in the addendum to the final PSR produced on December 22, 2017. Undersigned counsel inserts that objection in this memorandum, and will rest on the papers with respect to this objection at sentencing.

**IV.   A SENTENCE OF HOME CONFINEMENT WOULD BEST SERVE THE PURPOSES OF SENTENCING**

From the time of counsel's initial meeting with Paul Hursey, he conveyed that he wanted "to plead guilty and accept the consequences of what [he] did." First, the requested sentence would reflect the seriousness of the offense, provide just punishment and deterrence, and protect the public. Mr. Hursey has never spent a day in jail; any prison sentence will be a lengthy one for this

48 year-old-man, and will impose a serious punishment on him. Paul, who has never shown a propensity towards criminal conduct, has already demonstrated that he has been deterred from committing future crimes through his remorse and rehabilitation efforts. A 1-year sentence of house arrest, with work release, is sufficient to enforce Paul's already established deterrence, and to protect the public from any further crimes committing by Paul.

     Second, the requested sentence would reflect the impact of Paul's personal history and characteristics. This crime was a one-time only event in Paul's otherwise law-abiding life. He took responsibility for the conduct, and since arrest, has been in complete compliance with his pretrial release conditions. He has maintained employment, his relationship with his children, and has remarried, all actions demonstrating that he returned to being a productive member of society as he was for all but 6-months of his 48-year life.

     Paul is truly remorseful. That remorse is not focused on facing jail time, or in now having a criminal conviction, although both are grave concerns for Paul. Rather, his remorse is focused on regrets - - having put himself in this position, ruining a lifetime of no criminal record, over the stress his behavior has caused his family, and the embarrassment and humiliation of having "sunk to a low level." His remorse is true, focusing on the effect of his behavior on the people for whom he cares and loves. His daughter's education may be interrupted as a result of Paul's criminal conduct. Ironically, he committed the smuggling so that he would have the money to support his daughter while she attended school. However, it is that very same smuggling conduct which may cost her an interruption in her schooling. It weighs heavily on his heart that he no longer believes himself to be a good role model for his children. Paul never wants to disappoint his family like this again. He will never be in this position again. Paul will not commit another

crime.

Paul regrets that his conduct causes his new wife so much anxiety and stress. She worries about him going to jail and over how long he will be gone. Paul has developed a very close relationship with Jennifer's grandson, 5-year-old Jeremiah, and he worries over how is absence is going to affect Jeremiah, as well as who will be available to care for him while Paul is in jail. At times, Paul believes that he has betrayed Jennifer's trust, and has failed her and their grandchild and their marriage. Paul does not think his apology and Jennifer's forgiveness and understanding settles the matter between them; Paul believes that never being in this position again is the only way to remedy what his conduct has cost them. No sentence of jail time is necessary to deter Paul from re-committing. His remorse and sincere appreciation and acknowledgment of what his conduct has cost those most dear in his life is true deterrence.

Paul realizes that his conduct necessitates punishment. From his first meeting with counsel, and in every meeting and conversation with counsel since, Paul has asked when he will likely go to jail. He believed from the beginning that jail was a necessary result of his conduct. Jail is punishment; society generally sees jail as punishment. However, jail is not the only form of punishment.

Paul has been punished, and he will continue to be punished even if he does not go to jail. He has suffered severe emotional distress over this situation. The shame, humiliation, loss of self-esteem, and fear of the effects his conduct will have on his family is punishment. Repeatedly, from his children and his wife, counsel was told that Paul "will never do anything like this again; cannot believe he even did this conduct," and that "he doesn't need jail, he already has himself in jail and no punishment can be worse than what he is doing to himself." It

is telling that the people who know him best, know that he does not belong in jail. They witness his self-imposed punishment, and say that it is enough. Jail is more than is necessary in this case.

## V.     **CONCLUSION**

A sentence must be sufficient, but not greater than necessary to accomplish the sentencing goals of retribution, deterrence, incapacitation, and rehabilitation.  It is respectfully submitted that these goals can be achieved by a sentence below the advisory Guidelines range. For all of the above-stated reasons, and any other reasons that this Court may find, Paul Hursey respectfully requests a sentence of 1-year of house arrest, with a condition for work release, followed by a 3-year term of supervised release.

                                        Respectfully submitted,

Dated: December 28, 2018

                                        By:    s/Dina Chavar
                                        DINA CHAVAR, ESQUIRE
                                        1007 North Orange Street
                                        The Nemours Building, 4th Floor
                                        Wilmington, DE 19801
                                        302-256-0804
                                        dina@dinachavar.com